## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 19 2020, 6:49 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Katherine A. Harmon
Jared S. Sunday
Mallor Grodner LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Dawn Marie White
Emswiller, Williams, Noland & Clarke, LLC
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Sheena N. Reel,

*Appellant-Respondent,*

v.

Joshua S. Reel,

*Appellee-Petitioner.*

May 19, 2020

Court of Appeals Case No.
19A-DR-1328

Appeal from the Marion Superior Court

The Honorable David J. Dreyer, Judge

Trial Court Cause No.
49D10-1309-DR-35485

**Najam, Judge.**

## Statement of the Case

[1] Sheena N. Reel ("Mother") appeals the dissolution court's modification of custody over her minor child following the dissolution of her marriage to

Joshua S. Reel ("Father"). Mother raises three issues for our review, which we revise and restate as the following two issues:

1.    Whether the dissolution court abused its discretion when it limited Mother's parenting time to supervised visitation.

2.    Whether the dissolution court abused its discretion when it ordered Mother to pay a portion of Father's attorney's fees.

We affirm and remand with instructions.

## Facts and Procedural History

Father and Mother were married, and they have one minor child together, E.R., born July 8, 2012 ("Child"). Pursuant to an agreed entry, the dissolution court dissolved the parties' marriage in October 2014. Following the dissolution of the marriage, the court granted Mother primary physical custody of Child, and the court granted Father parenting time.

On April 19, 2017, Father filed an emergency petition for modification of custody and parenting time. In that petition, Father alleged that there had been "numerous occasions" when Mother "completely failed to notify Father of her inability to care for" Child, "failed to provide Father with notice of her inability to care for" Child, and "failed to timely pick up [Child] from her daycare," which Father asserted resulted in Mother's "neglect" of Child. Appellant's App. Vol. II at 66. Father also alleged that Mother was "not placing [Child] as a priority" and that, due to her "forgetfulness, lack of planning, or tiredness, it

has become unsafe for [Child] to remain in Mother's primary care." *Id.* at 68. Father further asserted that Mother was exhibiting "erratic" behavior that caused Father to believe that Mother was using medications that had not been prescribed to her or using excessive doses of prescribed medications. *Id.* at 69.

[5] The next day, the Indiana Department of Child Services ("DCS") received a report that Mother had failed to pick Child up from daycare. During the ensuing investigation, Child reported to DCS that Father had touched her inappropriately. Mother and Child's maternal grandmother also reported to DCS that Child had told them that Father had touched her inappropriately. As a result of Child's allegations, Mother had Child examined by two different physicians. Neither exam revealed any evidence that Child had been a victim of sexual abuse.

[6] Thereafter, on May 22, Mother filed her response to Father's emergency petition in which she asserted that she had not neglected Child but that she was "stressed and overworked," which caused her to miss picking Child up from daycare on two occasions. *Id.* at 71. In addition, Mother asserted that Father had touched Child "inappropriately." *Id.* Accordingly, Mother requested that she maintain physical custody. Mother also sought an *ex parte* order of protection for her and Child, which motion the dissolution court granted. Subsequently, DCS received a report regarding Father's alleged conduct with Child.

[7]     The dissolution court held a hearing on Father's emergency petition for modification of custody on June 1 and June 13. During the first part of the hearing, the court ordered the parties to submit to drug tests. The parties complied, and Mother tested positive for amphetamines, for which she did not have a valid prescription. Following the hearing on June 13, the court ordered the parties to maintain the current custody and parenting time arrangement, but the court appointed a guardian ad litem ("GAL") to investigate the allegations against Mother contained in Father's emergency petition. The court also dismissed the protective order against Father as to Child but left in place the protective order as to Mother.

[8]     Thereafter, on June 27, DCS filed a petition alleging that Child is a child in need of services ("CHINS"). In its petition, DCS asserted that Child had "disclosed being touched in an inappropriate and sexual manner by" Father. *Id*. at 143. DCS also asserted that Mother was using illegal drugs, which "seriously hinder[ed] her ability" to care for Child, and that Mother had "demonstrated erratic behavior[.]" *Id*.

[9]     Pursuant to local rules, the dissolution court consolidated the custody proceeding, the protective order matter, and the CHINS petition and transferred the case to the juvenile court. On June 28, the juvenile court authorized DCS to remove Child from her parents' care, and DCS placed Child with Father's sister. That court then authorized Mother and Father to participate in supervised visitation with Child.

[10] Based on the allegations against Father, the police investigated Father. The officer who investigated Father stated that it was "very clear" that Father did not molest Child. *Id*. at 171. The officer further believed that Child "was coached to make her initial (and only) claims of sexual abuse by her Mother." *Id*. The officer ultimately closed the case, and the State did not file any charges against Father. Mother complained to the officer's supervisor and asked to reopen the case, which the supervisor declined to do. Mother then proceeded to contact numerous other law enforcement agencies and other offices with the allegations against Father.

[11] On October 17, the juvenile court ordered temporary in-home visitation of Child with Father. The court ordered Mother to continue to participate in supervised visitation and to submit to a psychological evaluation. The results of that evaluation demonstrated that Mother presents a "biased" picture of herself in which she "minimized personal shortcomings, rationalized her behavior, and overstated her psychological adjustment." *Id*. at 189. The psychologist also concluded that Mother's "psychological functioning" warranted weekly therapy sessions for Mother. *Id*. at 190.

[12] Thereafter, during one of Mother's supervised visits with Child in November, Mother attempted to remove Child from the facility. In addition, Mother demonstrated "erratic behaviors" with Child's therapist. *Id*. at 162. Accordingly, DCS filed a motion to suspend Mother's parenting time, which motion the juvenile court granted.

[13]     During the CHINS proceeding, Child engaged in therapy. Child told her first therapist, Katie Wilson, that Child knew why Wilson was there, but that "it's not true. My mom told me it happened[.]" *Id*. at 170. She also told Wilson that the allegations against her Father were not true and that she felt "badly about having made the false accusations against her Father." *Id*. Child then told her second therapist, Rachael Ference, that she was "frustrated with continually being asked" questions regarding the alleged abuse, and Child "reported that she had told other people that that [abuse] did not occur." Tr. Vol. II at 16. Child also told Ference that Mother had told her that she was going to live with Mother and would not be able to see Father anymore, which Mother said was a "secret." *Id*. at 17. That statement from Mother "visibly upset" Child. *Id*. And Child told Ference that Mother had told her that, if she went to Father's, she would not be able to see Mother anymore.

[14]     On January 23, 2018, the juvenile court held a fact-finding hearing on the CHINS petition. During the hearing, the evidence demonstrated that Child "ultimately stated that no such [sexual] abuse [by Father] had occurred and that Mother had told her to make the allegations." Appellant's App. Vol. II at 170. As a result, DCS "changed its belief that Father is the perpetrator of abuse" and amended its petition based on its belief that "Mother is abusing [Child] by making false allegations of sexual abuse of [Child] by Father[.]" *Id*.

[15]     Following the hearing, the court concluded that Child's physical and mental well-being "is seriously endangered in her Mother's care because Mother continues to make false allegations that [Child] was sexually molested by her

[F]ather" and because Mother continues to exhibit "erratic and bizarre behavior[.]" *Id*. at 171. Accordingly, the juvenile court adjudicated Child a CHINS. The court continued Child's placement with Father and reinstated Mother's participation in supervised visitation with Child.

[16] Mother engaged in supervised visits with Child from March until May, when she began to engage in unsupervised visits. By June, Mother was exercising unsupervised parenting time from Wednesday to Saturday each week. On June 5, DCS filed a request to terminate its wardship over Child based on its conclusion that "all reasons for DCS involvement have been remedied." *Id*. at 214. In response to DCS's request to terminate its wardship over Child, Father filed a motion for custody. In that motion, Father asserted that, "[b]ased on the current custody arrangement" that was in place following the dissolution of the parties' marriage, a closure of the CHINS case would place Child back in Mother's care, which Father asserted was "not in [Child's] best interest and is outside the support and recommendation of her previous therapist, current therapist[,] and the GAL."[1] *Id*. at 218-19.

[17] Thereafter, DCS filed a progress report in which it reported that Mother had "consistently" tested negative for all substances, that she is "actively engaged" in home-based therapy, and that Mother has "consistently engaged" in visits with Child. *Id*. at 227. Accordingly, DCS recommended that the CHINS

---

[1] The GAL who was appointed by the juvenile court to represent Child during the CHINS proceeding was not the same GAL who was appointed by the dissolution court to represent Child in the custody matter.

matter be dismissed. The GAL had no safety concerns for Child if Child were to stay in Father's care. However, the GAL did not agree to having the case closed. At that time, the court did not dismiss the CHINS action, but the court transferred the custody modification matter back to the dissolution court. The parties continued to exercise near equal parenting time. Accordingly, on November 8, DCS again moved to terminate its wardship over Child. The court dismissed the CHINS case on November 9.

[18] After the juvenile court transferred the custody matter back to the dissolution court, the court appointed Julie Camden as Child's GAL. During the course of her investigation, GAL Camden asked both Mother and Father to submit to a polygraph test. The results of Father's polygraph test indicated "no deception" and that he had never touched Child in an inappropriate manner. Ex. at 11.[2] The results of Mother's test indicated "deception." *Id*. Mother then "admitted to coaching [Child] through leading questions[.]" *Id*.

[19] Based on her investigation, GAL Camden concluded that Mother "appears to lack self-awareness," does "not accept responsibility for her behaviors or actions," and "does not realize that subjecting her daughter to the behaviors she has subjected [Child] to is causing [Child] damage." *Id*. at 12. Accordingly, GAL Camden recommended that Father have primary physical custody of Child. She further recommended that Mother attend therapy with a Ph.D.-level

---

[2] Our pagination of the Exhibits Volume is based on the .pdf pagination.

provider and that Mother only have supervised visits with Child until the provider "can state that Mother understands the consequences of her actions and can have unsupervised parenting time." *Id.*

[20] The dissolution court held a hearing on Father's motion to modify custody on December 4, 2018, and February 26, 2019. During the hearing, Ference testified that she has "concerns" for Child's mental health because Mother had told Child information "that was not age appropriate" about Child's living arrangements. Tr. Vol. II at 23. She further testified that it was "emotionally damaging" for Child to be "coached into saying that someone molested her when she was not" molested and that, should that behavior continue, Child could experience "behavioral problems stemming from her struggle to deal with her emotions." *Id.* at 23, 24. Ference also testified that she did not agree with the decision to allow Mother to have unsupervised parenting time.

[21] GAL Camden then testified that she was concerned about "emotional abuse" of Child by Mother. *Id.* at 48. Specifically, she testified that it was "very apparent" to her that Mother "coaches the [C]hild to say what she has to say and doesn't think about the consequences that it's going to have" and that Mother is "more concerned at winning" against Father. *Id.* at 50, 51. She further testified that Mother is "[v]ery" manipulative of people and that she is "not very self-aware." *Id.* at 51. And GAL Camden testified that Mother needs therapy with a Ph.D. because she "doesn't tend to recognize problems that occur" and that she "lacks a lot of self-perception." *Id.* at 65. However, GAL Camden testified that Mother "did not complete" the weekly therapy sessions

as recommended in the psychological evaluation and that Mother is not receiving therapy from a Ph.D.-level provider. *Id*. at 87.

[22] GAL Camden then recommended that Mother only have supervised visits with Child because otherwise Mother "can continue the path she's on and we don't have any way to stop it." *Id*. at 66. GAL Camden also testified that she has not seen a change in Mother's "thought process" since the day she met Mother and that she believes Mother's coaching of Child is "still going on." *Id*. at 134, 170. She further testified that she has concerns with Child "learning how to be honest" and that, if Mother's visitation is not supervised, Child's physical or mental health will be "impaired." *Id*. at 66, 132.

[23] Following the hearing, the court entered findings and conclusions in which it adopted a "modified version" of the GAL's recommendations and ordered that Father have primary physical custody of Child. Appellant's App. Vol. II at 34. Specifically, the court found that:

> due to Mother's maniacal pursuits to have Father repeatedly investigated for sexual abuse of the minor child, which involved Mother's coaching of [Child] to make false statements alleging sexual molestation by her Father and having [Child] examined by several medical providers regarding the sexual abuse, Mother's secret telling to the [C]hild regarding Mother's plans to have [Child] live with her and never see Father (which was visibly upsetting to the child and made her fearful), Mother's lack of self-awareness, Mother's past history of keeping the minor child from Father for significant periods of time based on these allegations, Mother's disregard for her own mental health issues, and Mother's past failed drug screens which she blamed on

ingestion of date rape drugs, Mother's unrestricted parenting time would endanger the child's emotional development.

*Id*. at 36-37.

[24] The court ordered Mother to enroll in therapy with a Ph.D.-level provider. The court further ordered that Mother have supervised visits with Child until the therapist determines that Mother "understands the harm and consequences of her actions" and "poses no significant threat of repeating her actions[.]" *Id*. at 36 (emphasis removed). At that time, the court will schedule a hearing "in order to consider unsupervised parenting time." *Id*. at 37.

[25] The court also found that Father had incurred $30,493.50 in attorney's fees "for the defense of the false sexual molestation allegations raised by Mother and for his petition for custody of [Child]." *Id*. at 40. In addition, the court agreed that "Mother is the cause of the CHINS case initiation and the initiation of Father's original motion for emergency custody." *Id*. Accordingly, the court ordered Mother to pay $20,000 of Father's attorney's fees, which the court ordered Mother to pay not in a lump sum or by a date certain but in monthly installments of not less than $100. The court additionally ordered that Mother's payments toward Father's attorney's fees "shall be additionally offset by any future child support award owed by Father to Mother, until said attorney fee award is fully paid." *Id*. at 41. This appeal ensued.

# Discussion and Decision

## *Issue One:  Supervised Visitation*

[26]   Mother first contends that the dissolution court abused its discretion when it limited her parenting time to supervised visitation.[3]  Decisions regarding parenting time require us to "'give foremost consideration to the best interests of the child.'"  *Perkinson v. Perkinson*, 989 N.E.2d 758, 761 (Ind. 2013) (quoting *Marlow v. Marlow*, 702 N.E.2d 733, 735 (Ind. Ct. App. 1998)).  Where, as here, the trial court's judgment is based on findings of fact and conclusions thereon following an evidentiary hearing, we review such judgments under our clearly erroneous standard.  *Steele-Giri v. Steele (In re Marriage of Steele-Giri)*, 51 N.E.3d 119, 123 (Ind. 2016).  Under that standard, we first ask whether the evidence supports the court's findings, and we then ask whether the findings support the judgment.  *Id*.

[27]   Moreover,

> there is a well-established preference in Indiana for granting latitude and deference to our trial judges in family law matters. Appellate courts are in a poor position to look at a cold transcript of the record[] and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence.  On appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by

---

[3] Mother does not appeal the dissolution court's order that Father have primary physical custody over Child.

appellant before there is a basis for reversal. Appellate judges are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment.

*Id.* at 124 (citations and quotation marks omitted).

[28] Indiana has long recognized that the right of parents to visit their children is a precious privilege that should be enjoyed by noncustodial parents and, thus, a noncustodial parent is generally entitled to reasonable visitation rights. *See Perkinson*, 989 N.E.2d at 762. However, a court can restrict or deny parenting time to a child. That restriction or denial is governed by Indiana Code Section 31-17-4-2 (2019), which provides:

> The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child. However, the court shall not restrict a parent's parenting time rights unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development.

Although the statute uses the word "might," this Court "has previously interpreted the language to mean that a court may not restrict parenting time unless that parenting time 'would' endanger the child's physical health or emotional development." *S.M. v. A.A.*, 136 N.E.3d 227, 230 (Ind. Ct. App. 2019).

[29] On appeal, Mother asserts that the dissolution court abused its discretion when it limited her parenting time with Child to supervised visitation because Mother has made "remedial efforts," the CHINS case had been successfully dismissed,

and Mother has been exercising unsupervised visitation with Child for approximately one year "without incident." Appellant's Br. at 27. And Mother maintains that "each of the examples of Mother's conduct" cited by the dissolution court "occurred well in the past, prior to her receiving treatment and assistance" throughout the CHINS proceeding. *Id.*

[30] However, the evidence demonstrates that Mother coached Child into making false allegations of sexual abuse against Father. Indeed, following Mother's failed polygraph examination, she "admitted to coaching [Child] through leading questions[.]" Ex. at 11. While Mother contends that she has resolved that behavior, GAL Camden testified that she has not seen a change in Mother's "thought process" since the day she met Mother. Tr. Vol. II at 170. And she testified that she believes that Mother's coaching of Child is "still going on." *Id.* at 134.

[31] Further, both Ference and GAL Camden testified about the negative effects that Mother's coaching has on Child's well-being. Specifically, Ference testified that it was "emotionally damaging" for Child to be "coached into saying that someone molested her when she was not" molested and that, should that behavior continue, Child could experience "behavioral problems stemming from her struggle to deal with her emotions." Tr. Vol. II at 23, 24. In addition, GAL Camden testified that she has concerns with Child "learning how to be honest." *Id.* at 132. And Gal Camden testified that, if Mother's parenting time is not supervised, Child's physical or mental health will be "impaired." *Id.* at 66.

[32] The evidence also demonstrates that Mother lacks "self-awareness," does "not accept responsibility for her behaviors or actions," and "does not realize that subjecting her daughter to the behaviors she has subjected [Child] to is causing [Child] damage." Ex. at 12. Accordingly, GAL Camden recommended that Mother attend therapy with a Ph.D.-level provider and that Mother only have supervised visits with Child until the provider "can state that Mother understands the consequences of her actions and can have unsupervised parenting time." *Id.* However, GAL Camden testified that Mother "did not complete" her weekly therapy sessions and that Mother was not receiving therapy from a Ph.D.-level provider. Tr. Vol. II at 87.

[33] Based on that evidence, we cannot say that the dissolution court abused its discretion when it concluded that Mother's "unrestricted parenting time would endanger the child's emotional development" and limited Mother's parenting time to supervised visitation. Appellant's App. Vol. II at 37. Mother's arguments on appeal are simply a request that we reweigh the evidence, which we cannot do. We affirm the dissolution court's order regarding Mother's supervised visitation with Child.

## Issue Two: Attorney's Fees

[34] Mother next asserts that the dissolution court erred when it ordered her to pay a portion of Father's attorney's fees. We review a trial court's award of attorney's fees for an abuse of discretion. *J.B. v. S.W. (In Re the Paternity of G.G.B.W.)*, 80 N.E.3d 264, 272 (Ind. Ct. App. 2017). An abuse of discretion occurs when the

court's decision is clearly against the logic and effects of the facts and circumstances before the court of if the court has misinterpreted the law. *Id.*

[35] In awarding attorney's fees, the trial court "must consider the economic resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and such factors that bear on the reasonableness of the award." *Id.* The trial court may also consider any misconduct by one party that causes the other party to directly incur additional fees. *Id.*

[36] Here, the dissolution court ordered Mother to pay a portion of Father's attorney's fees based on its findings that "Mother is the cause of the CHINS case initiation and the initiation of Father's original motion for emergency custody" and that Mother "launched a range of false sexual molestation allegations against Father" that caused him to incur substantial attorney's fees. Appellant's App. Vol. II at 40. On appeal, Mother does not challenge either of those findings, nor does she make any argument that the court erred when it relied on those findings to support its order regarding attorney's fees. Rather, Mother's sole argument on this issue is that the dissolution court abused its discretion when it ordered her to pay a portion of Father's attorney's fees because there "is no indication in the Order that any economic conditions were considered" by the dissolution court. Appellant's Br. at 32. We cannot agree.

[37] While the dissolution court awarded Father attorney's fees based on its findings regarding Mother's false allegations against Father and other wrongdoing, the

court also heard evidence regarding the economic circumstances of the parties. Indeed, Mother testified that she has been a nurse since 2009 and that she earns $1,150 per week, which equates to $59,800 per year. In addition, Mother submitted as evidence a verified financial declaration form in which she outlined both her income and all of her monthly expenses. And Mother testified that she had to sell her home and move in with her mother in order to pay for her attorney's fees. Father then testified that he owns his own business and that he made $178,679 in 2017 but that his income in 2018 was going to be "quite higher." Tr. Vol. III at 158. And Father testified that he owns his home, where he resides with his fiancée. Accordingly, it is clear that the parties submitted evidence to the court regarding their respective resources.

[38] Further, it is clear that the court considered that evidence of both parties' financial conditions. Indeed, the court included findings regarding the parties' incomes and employments in its order. *See* Appellant's App. Vol. II at 39. But it is also apparent that the court determined that Mother's actions of making false sexual molestation allegations against Father, which Mother does not deny and which was the cause of most of Father's attorney's fees, warranted an award of attorney's fees to Father despite Mother's inferior economic position. We cannot say that the dissolution court abused its discretion when it ordered Mother to pay a portion of Father's attorney's fees.

[39] Still, Mother asserts, and Father agrees, that the court erred when it ordered that her monthly payments toward Father's attorney's fees be "offset" by any

future child support award that Father may be required to make to Mother.[4] Appellant's App. Vol. II at 41. We must agree with both parties. It is well settled that, "because the custodial parent acts in a fiduciary capacity when receiving child support payments, the payor cannot withhold support payments to offset a debt owed by the custodial parent to the payor." *Jenkins v. Jenkins*, 567 N.E.2d 136, 140 (Ind. Ct. App. 1991). In other words, although the money is paid to the custodial parent, "that person is merely a conduit—the payor's obligation is to the child, not to the custodian." *Id*. Accordingly, should Father be required to make child support payments in the future, that obligation will be to Child, not to Mother. Father will not be able to withhold those payments in order to offset the debt owed to him by Mother. We therefore hold that the court erred when it ordered that Mother's payments toward Father's attorney's fees be offset by any future child support payments that Father may be required to make to Mother.

### Conclusion

[40] In sum, the dissolution court did not abuse its discretion when it limited Mother's parenting time to supervised visitation until such time as her therapist believes that Mother is "safe to proceed with unsupervised parenting time with Child." Appellant's App. Vol. II at 37. And the court did not abuse its discretion when it ordered Mother to pay a portion of Father's attorney's fees in

---

[4] While Father is currently the custodial parent, it appears that the court included this provision in the event that Father should later be required to pay child support to Mother.

installments. But the court erred when it ordered that Mother's payments toward Father's attorney's fees be offset by any future child support payments Father may be required to make to Mother. Accordingly, we affirm the court's order regarding Mother's visitation and the court's order that Mother pay $20,000 toward Father's attorney's fees. But we remand with instructions for the court to strike the portion of its order offsetting Mother's debt to Father from any future child support payments Father may be required to make to Mother.

[41]    Affirmed and remanded with instructions.

Kirsch, J., and Brown, J., concur.